# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge William J. Martínez

Criminal Case No. 18-cr-101-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     **DERRICK DESEAN RICHARDSON,**

    Defendant.

## ORDER DENYING MOTION TO SUPPRESS

The Government charges Defendant Derrick Richardson with one count of being a felon in possession of a firearm and ammunition. *See* 18 U.S.C. § 922(g)(1). Richardson moves to suppress the gun and ammunition found by police officers on his person. (ECF No. 18.) The Court accepted further briefing on this motion (ECF Nos. 21 and 23) and held an evidentiary hearing on May 21, 2018. For the reasons explained below, the Court denies Richardson's motion.

## I. FACTUAL FINDINGS

From the testimony and exhibits presented at the suppression hearing, the Court finds as follows.

On the night of February 5, 2018, Denver police officers Lee Ingersoll and Wilbur Hall were on patrol in their marked police vehicle in the Park Hill neighborhood. Earlier that day, there had been a funeral for a murdered Tre Tre Crip gang member. Denver police feared this event might prompt a retaliatory shooting in the Park Hill

neighborhood, which is considered the territory of the rival Park Hill Bloods.  Thus, Ingersoll and Hall were conducting a high-visibility patrol in hopes of deterring violence.

At approximately 9:00 PM, the officers were driving westbound on East 35th Avenue approaching the intersection of Forest Street.  Ingersoll was behind the wheel.  As the vehicle entered the intersection, Ingersoll looked to his left (southward) and noticed someone walking southbound in the middle of Forest Street.  Ingersoll claims he decided to investigate this individual for violating Denver's jaywalking ordinance: "Where sidewalks are provided, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway."  Denver Revised Municipal Code ("DRMC") § 54-543(a).  Violating this ordinance is a "class B traffic infraction," DRMC § 54-4(b), with a potential penalty of a fine ranging from $15 to $100, *see* Colo. Rev. Stat. § 42-4-1701.

Ingersoll executed a sharp left turn onto Forest Street and activated his overhead lights and front-facing spotlights.  At that point, the person walking in the street, who turned out to be Richardson, was near a row of cars parked along the east side of Forest Street.  He eventually turned his back to those cars (*i.e.*, to face the middle of the street) with his hands open and held slightly in front of him, about chest-height.

Ingersoll quickly exited his vehicle and asked, "How you doing tonight?"  Richardson did not respond.  Ingersoll approached and announced, "I'm going to pat you down for weapons, boss, 'kay?"  With his right hand, he then reached forward and grasped Richardson's right wrist.  As he slowly began to pull Richardson's wrist behind his (Richardson's) back, Richardson bolted forward and out of Ingersoll's grasp.

Hall had exited the police vehicle by this time and was standing roughly in Richardson's attempted escape path.  A five- to ten-second foot chase ensued,

2

concluding with Ingersoll and Hall tackling Richardson and Ingersoll pinning him to the ground.  Hall then immediately frisked Richardson's waistband—having suspected from the beginning that Richardson was armed—and found a handgun.  Hall removed the gun, set it aside, and then assisted Ingersoll in handcuffing Richardson.  The officers placed Richardson in the back of their patrol vehicle.

## II.  BURDEN OF PROOF

On a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)."  *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2 (citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at n.35 and accompanying text (5th ed., Oct. 2017 update).

Richardson's motion reveals that his personal Fourth Amendment rights are implicated here.  He has therefore raised a *prima facie* case of a potential Fourth Amendment violation through a warrantless seizure and subsequent search, thus shifting the burden to the Government to justify the police officers' actions.

## III.  ANALYSIS

The Fourth Amendment to the U.S. Constitution safeguards the "[t]he right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures."  Generally speaking, to conduct a search or seizure in compliance with the Fourth Amendment, the police must obtain a warrant from a neutral

magistrate based on a finding of probable cause.  *See Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009).  Probable cause exists where

> the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested.  This is an objective standard, and thus the subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive.  Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances.

*Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (internal quotation marks and citations omitted; original alterations incorporated).

However, not all interactions with law enforcement trigger Fourth Amendment protection, or necessarily require probable cause or a warrant.  The Tenth Circuit has described three types of "police-citizen encounters," each of which requires a different level of suspicion to be permissible under the Fourth Amendment:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012).  Thus, although a warrantless arrest is unreasonable without probable cause that a crime has been committed, warrantless "detentions" that fall short of an arrest need only be justified by "reasonable suspicion."  *Id*.  These sorts of investigative detentions are known as *Terry* stops because the Supreme Court first began to establish the legal framework for such

4

detentions in *Terry v. Ohio*, 392 U.S. 1 (1968). The suspicion required by law enforcement to justify a *Terry* stop is "considerably less" than that required for probable cause. *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012).

The Tenth Circuit has further explained reasonable suspicion as follows:

> Reasonable suspicion is a less demanding standard than probable cause. Specifically, reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. To determine whether investigating officers had reasonable suspicion, we consider both the quantity of information possessed by law enforcement and its reliability, viewing both factors under the totality of the circumstances.

*United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013) (internal quotation marks, citations, and ellipses omitted). Reasonable suspicion, "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

Richardson argues that he was effectively under arrest from the moment the officers activated their vehicle's lights and approached with their show of authority, yet the arrest lacked probable cause; but, at a minimum, he argues he was subject to a *Terry* stop-and-frisk without reasonable suspicion. (ECF No. 18 at 4–5.)

The first question, then, is whether Richardson was in any way "seized" within the meaning of the Fourth Amendment:

> It is well-established that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. A person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

5

*United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012) (internal quotation marks and citations omitted; alterations incorporated). The Government does not argue that a reasonable person in Richardson's situation would have felt free to leave. Thus, there is no question that Richardson was "seized" when the officers stopped their vehicle, activated their lights, and approached with a show of authority.

The next question is the type of seizure: arrest or investigative detention (*i.e.*, *Terry* stop)? The distinction is significant because a search incident to arrest allows an officer to search for any evidence of a crime, whether or not the officer fears that the suspect is carrying a weapon. *See United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000). By contrast, the only sort of search permitted as part of a *Terry* stop is a patdown (or "frisk") for weapons, and *only* when the officer can "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968); *see also Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979) ("Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons.").

Richardson insists that he was immediately under arrest, not just detained for investigation purposes, from the moment the police officers activated their spotlights. (ECF No. 18 at 4; ECF No. 23 at 3.) But Richardson's arguments only address whether he was free to leave. (*See id.*) The "free to leave" test determines whether there has been a Fourth Amendment "seizure" of any kind, not whether the seizure is a *Terry* stop or an arrest. The Court has already concluded that Richardson was not free to leave. Concluding as much *raises* the *Terry*-stop-vs.-arrest question; it does not *answer* it.

The Court is thus left with the Government's argument. The Government

primarily contends that the stop was only a *Terry* stop, and it was justified by a reasonable suspicion that Richardson had violated the jaywalking ordinance. On this, it is important to note that the Government analogizes a stop in these circumstances to a traffic stop (*see* ECF No. 21 at 5), and the Court agrees with the analogy. The jaywalking ordinance is intended to promote traffic safety as much as pedestrian safety, and a violation is considered a "traffic infraction." DRMC 54-4(a).

"[T]he principles developed for investigative detentions set forth in *Terry*" still apply to traffic stops. *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). Moreover, the stop need not be justified by suspicion of *criminal* activity. An officer needs only "a reasonable articulable suspicion that a particular motorist"—or pedestrian, in this case—"has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

Richardson does not deny that he was walking in the road or that the officers saw him walking in the road, and he does not argue that the plain letter of the jaywalking ordinance does not apply to his conduct. He *does* insinuate racial profiling: "Until [Ingersoll and Hall arrived,] he had simply been an African-American man, alone, at night, minding his own lawful business, and doing what everyone in the United States does on a quiet residential street with no traffic; he had crossed the road to get to his car." (ECF No. 18 at 3.)[1] But Supreme Court precedent forecloses any inquiry along

---

[1] Richardson further elaborates that he had been visiting a friend in a house on the west side of Forest Street and needed to retrieve his cell phone charger from his car, which he had parked on the east side of Forest Street "approximately two to three car lengths down from the house [he was visiting]." (*Id.* at 2.) So he "angled across the street directly toward the car he had driven." (*Id.*) These statements are found in briefing only—Richardson did not testify at the suppression hearing. The Court therefore may not accept them as evidence. But even if it could, his version of events turns out to be irrelevant under the analysis applicable to his contact with Ingersoll and Hall.

7

these lines.

In *Whren v. United States*, the Supreme Court addressed an argument

> that in the unique context of civil traffic regulations probable cause is not enough. Since, [the defendant's] contend, the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation. This creates the temptation to use traffic stops as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exists. Petitioners, who are both black, further contend that police officers might decide which motorists to stop based on decidedly impermissible factors, such as the race of the car's occupants. To avoid this danger, they say, the Fourth Amendment test for traffic stops should be, not the normal one . . . of whether probable cause existed to justify the stop; but rather, whether a police officer, acting reasonably, would have made the stop for the reason given.

517 U.S. 806, 810 (1996). The Supreme Court unanimously rejected this invitation, explicitly disapproving "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.* at 813. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Id.* at 814 (emphasis in original).

*Whren* addressed vehicular infractions, but there is no principled reason to distinguish related ordinances such as the jaywalking ordinance at issue here. Nor does Richardson attempt to distinguish it. Thus, his race and the officers' subjective motivations are irrelevant for present purposes. In this light, it is beyond dispute that the officers had reasonable suspicion to initiate this "traffic stop." Indeed, even if the officers misperceived Richardson's actions, a *Terry* stop is justifiable if it was based on

a "reasonable factual mistake." *Heien v. North Carolina*, 135 S. Ct. 530, 534 (2014).

But establishing suspicion sufficient to detain is only the first step. The Government must also establish that the officers reasonably suspected Richardson to be armed and dangerous. Without that suspicion, they could not lawfully perform an immediate search for weapons. *See Sibron*, 392 U.S. at 64; *Ybarra*, 444 U.S. at 93–94.

If Ingersoll had *succeeded* in frisking Richardson at that point, the Court would have granted Richardson's motion to suppress. Ingersoll's and Hall's testimony at the suppression hearing was frankly not credible as to the issue of why they immediately suspected Richardson to be armed. They testified that: (1) Richardson did not immediately turn around when Ingersoll turned on the police vehicle's lights, but instead either stopped in the roadway or continued walking in the roadway with his back facing the police vehicle (Ingersoll first testified that Richardson stopped, and later testified that he kept walking); (2) Richardson had his hands in his pockets; (3) inconsistently, Hall observed at least Richardson's left hand out of his pocket "doing something" that Hall believed was suspicious as Richardson continued to walk in the roadway (even though the officer with the clearest vantage point to observe Richardson's left hand was Ingersoll, in the driver's seat); and (4) Richardson never fully turned around or made eye contact with the officers.

Momentarily setting aside the inconsistencies in this testimony, there is simply nothing about a person walking with his hands in his pockets on a February night in Denver that can reasonably raise a suspicion of being armed. Similarly, a pedestrian failing to turn around to face a police vehicle's lights does not reasonably raise a suspicion of being armed. Neither does failure to make eye contact with an authority

9

figure.

In any event, there *are* inconsistencies in the officers' testimony, both internal (as already pointed out) and external. Concerning the latter, the video evidence shows that Richardson's hands were visible and in front of his body from the moment Ingersoll opened the driver's side door of the police vehicle. Therefore, even if hands-in-pockets may be considered suspicious, that suspicion was gone before Ingersoll announced, "I'm going to pat you down for weapons, boss." In short, Ingersoll and Hall did not, at that point, possess the level of suspicion required to frisk Richardson for weapons.

However, the only thing Ingersoll accomplished before Richardson attempted to flee was to grab Richardson's right arm and begin to bend it behind his back. The officers had not patted him down or discovered a weapon. In other words, there was, as yet, no Fourth Amendment violation with respect to discovery of the firearm. This makes all the difference in this case.

A person who escapes an officer's grasp is no longer "seized" under the Fourth Amendment, but is instead in a "period of fugitivity," and anything officers learn during that "period of fugitivity" can justify their subsequent seizure, assuming they catch up with the suspect. *See California v. Hodari D.*, 499 U.S. 621, 624, 625 (1991).[2] Even more importantly, flight from the police is itself a crime. *See* Colo. Rev. Stat. § 18-8-

---

[2] Richardson does not argue that his *attempt to flee* was *itself* the "fruit of the poisonous tree," perhaps because there was no "poisonous tree" at the time he tried to escape—the officers had reasonable suspicion to detain him (although not to frisk him), and they had not yet found anything incriminating through unconstitutional means. Additionally, the Supreme Court has refused this sort of "police made me do it" argument: "Unlawful orders will not be deterred . . . by sanctioning through the exclusionary rule those of them that are not obeyed. Since policemen do not command 'Stop!' expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures." *Hodari D.*, 499 U.S. at 627.

10

104(1)(a), (2) ("A person commits obstructing a peace officer . . . when, by using . . . physical interference, . . . such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority[.] * * * It is not a defense to a prosecution under this section that the peace officer was acting in an illegal manner, if he or she was acting under color of his or her official authority."); DRMC § 38-31(a) ("It shall be unlawful for any person, in any way, to interfere with or hinder any police officer, any member of the police department, or any person duly empowered with police authority, while such officer, member, or person duly empowered with police authority is discharging or apparently discharging their duties."); *id.* § 38-32(a) ("It shall be unlawful for any person to resist any police officer, any member of the police department, or any person duly empowered with police authority, while such officer, member or person duly empowered with police authority is discharging or apparently discharging their duties.").

If Richardson had been under arrest from the moment the vehicle's lights activated, as he claims, it would likewise have been a crime to flee. *See* Colo. Rev. Stat. § 18-8-103(1)(a), (2) ("A person commits resisting arrest if he knowingly prevents or attempts to prevent a peace officer, acting under color of his official authority, from effecting an arrest of the actor or another, by * * * [u]sing any other means which creates a substantial risk of causing bodily injury to the peace officer or another. * * * It is no defense to a prosecution under this section that the peace officer was attempting to make an arrest which in fact was unlawful, if he was acting under color of his official authority, and in attempting to make the arrest he was not resorting to unreasonable or excessive force giving rise to the right of self-defense."); *see also Hodari D.*, 499 U.S. at

627 ("Street pursuits always place the public at some risk . . . .").

Even if there is some question whether Richardson actually violated any of the foregoing statutes or ordinances, the officers certainly had probable cause to suspect their violation. And once that probable cause existed, the current state of Fourth Amendment case law gave the officers virtually "un-suppressable" authority to search Richardson "incident to arrest." "A warrantless search preceding an arrest is a legitimate 'search incident to arrest' as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search"—and this is so "[w]hether or not the officer intended to actually arrest the defendant at the time of the search." *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). "[T]he legitimate basis [inquiry] is purely an objective standard and can be [satisfied by] *any crime*, not merely that for which the defendant is ultimately charged." *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) (emphasis in original). In short, if objective probable cause exists to arrest for any offense, an officer may search the individual and then arrest him or her, even if the arrest is for an offense discovered through the search and not for the offense that retroactively justifies the search.

Under this authority, for purposes of the resolution of his Motion Richardson was his own worst enemy. By fleeing, he gave the officers probable cause to arrest for one or more crimes. With probable cause, the officers were justified in conducting a full search incident to the arrest that was about to happen. Hall's intentional search of Richardson's waistband for a weapon was therefore permissible.

## IV. CONCLUSION

For the foregoing reasons, Richardson's Motion to Suppress (ECF No. 18) is DENIED. By separate order to be entered today, the Court will set a new jury trial and final trial preparation conference.

Dated this 28th day of November, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge